J-S01005-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| HAMETT DIAZ | : | |
| | : | |
| Appellant | : | No. 1965 EDA 2019 |

Appeal from the PCRA Order Entered June 11, 2019
In the Court of Common Pleas of Monroe County Criminal Division at
No(s):  CP-45-CR-0000396-2014

BEFORE:   BOWES, J., KUNSELMAN, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BOWES, J.:                         Filed: May 7, 2020

Hamett Diaz appeals from the June 11, 2019 order denying his petition

for relief under the Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-

9546.  After thorough review, we affirm.

We reproduce the trial court's summary of the underlying facts from this

Court's opinion on direct appeal:

> [Appellant] is the stepfather of K.C., a 15 year old female.  K.C.
> has a 17 year old friend, K.O., who is the victim (hereinafter
> referred to as "Victim").  On October 19, 2013, at around 12:00
> p.m., [Appellant] drove K.C. and Victim from Blakeslee, Monroe
> County, Pennsylvania to New York City, NY, so that K.C. and
> Victim could get their nails done.  During the drive, [Appellant]
> furnished K.C. and Victim with alcohol.  [Appellant] also drank
> alcohol.  While in New York when K.C. was getting her nails done,
> [Appellant] and Victim went to a liquor store in order to purchase
> more alcohol.

---

[*] Retired Senior Judge assigned to the Superior Court.

After K.C. and Victim were finished with their nails, [Appellant], K.C., and Victim headed back to Pennsylvania. Upon returning to Pennsylvania, they stopped at a Burger King restaurant for Victim to use the bathroom. Victim was so intoxicated, she required assistance walking to and using the bathroom. Around 11:00 p.m., [Appellant], K.C. and Victim arrived back at [Appellant] and K.C.'s home in Blakeslee. When they arrived at the home, [Appellant] sent K.C. into the house to see if K.C.'s mother, [Appellant's] wife, was awake.

After K.C. went into the house, [Appellant] drove off with the Victim to a secluded service road. At this point, Victim began zoning in and out. After pulling onto the service road, Victim recalls [Appellant] getting out of the minivan, opening the trunk door, and laying out the backseat. [Appellant] then called Victim to move to the back of the minivan. When Victim moved to the back of the minivan she hit her head. The next thing Victim recalls she was lying on her back in the rear of the minivan. Victim then remembers [Appellant] putting his mouth on her vagina. Victim recalls [Appellant] putting his penis in her vagina. She testified that she was in and out of consciousness and that she was so intoxicated she was slurring her words and unable to speak.

[Appellant] and Victim arrived back at [Appellant] and K.C.'s house and she was unable to walk. Victim stated she "crawled" up the stairs. When Victim entered the house, she was crying and she immediately told K.C. that she and [Appellant] had driven down the mountain and she believed "something may have happened." K.C. then helped Victim wash up, get changed, and get into bed.

Victim later woke up around 4:00 a.m. on October 20, 2014, and told K.C. that she thought [Appellant] had sex with her. K.C. confirmed that Victim had come back to the house crying. Victim then called her ex-boyfriend about the incident. Victim's ex-boyfriend told his mother; the ex-boyfriend's mother called Victim's mother who called the police. Victim's mother then drove to [Appellant's] house and waited with Victim until the police arrived. The police arrived with an ambulance and Victim was transported to the hospital.

*Commonwealth v. Diaz*, 152 A.3d 1040, 1042 (Pa.Super. 2016) (quoting Trial Court Opinion, 10/2/15, at 1-3).

Appellant was convicted by a jury of rape of a person who is unconscious, aggravated indecent assault, unlawful contact with a minor, corruption of minors, and endangering the welfare of children. The trial court sentenced him to a mandatory minimum sentence on the rape conviction pursuant to 42 Pa.C.S. § 9714(a)(2) ("Where the person had at the time of the commission of the current offense previously been convicted of two or more such crimes of violence arising from separate criminal transactions, the person shall be sentenced to a minimum sentence of at least 25 years of total confinement"). On appeal, this Court vacated the judgment of sentence after concluding that the mandatory minimum sentence was inapplicable. Appellant was resentenced on September 8, 2017, to an aggregate term of incarceration of 140 to 280 months, and he did not file a direct appeal.

On September 15, 2018, Appellant filed the instant, counseled PCRA petition in which he identified three omissions of trial counsel that he contended deprived him of a fair trial. First, he faulted counsel for failing to object to inculpatory hearsay testimony elicited from Victim. Second, he alleged that counsel should have called four witnesses, some of whom would have impeached Victim's testimony regarding her level of intoxication and others also offering testimony as to the reasons why Appellant went to New York the next day. Several of the witnesses would have confirmed that

Appellant's minivan remained in Appellant's driveway for at least one week in order to contradict State Police Trooper Wesnak's testimony that he did not obtain a search warrant for DNA testing on the minivan because he could not locate it until such time as the testing would have been futile. Finally, Appellant alleged that counsel was ineffective when he failed to object and seek a curative instruction when the Trooper testified that Appellant opted not to answer questions on the advice of his attorney.

Following an evidentiary hearing on March 25, 2018, the PCRA court concluded that no relief was due. Appellant timely appealed, and both Appellant and the PCRA court complied with Pa.R.A.P. 1925. Appellant presents three issues for our review:

I. Whether the trial court erred in denying the [PCRA] Petition where trial counsel was ineffective in failing to object to the admission of hearsay testimony in which multiple witnesses testified that [Appellant's] step-daughter, K.C., confirmed that [Appellant] raped [Victim] and encouraged [Victim] to call for help.

II. Whether the trial court erred in denying the[PCRA] Petition where trial counsel was ineffective in failing to call defense witnesses who would have directly impeached critical testimony from the Commonwealth's witnesses such as the allegations that [Victim] was too intoxicated to consent to sexual intercourse and that [Appellant] had tampered with the alleged crime scene and fled the jurisdiction.

III. Whether the trial court erred in denying the [PCRA] Petition where trial counsel was ineffective in failing to object to the investigating officer's disparagement of [Appellant's] refusal to give a statement and instead hire an attorney on the basis that the testimony violated [Appellant's] rights to counsel and his rights against self-incrimination under the Pennsylvania and United States Constitutions.

- 4 -

Appellant's brief at vi.

> On appeal from the denial of PCRA relief,
>
> our standard of review calls for us to determine whether the ruling of the PCRA court is supported by the record and free of legal error. The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions.

***Commonwealth v. Williams***, 196 A.3d 1021, 1026-27 (Pa. 2018) (internal citations and quotations omitted).

All three of Appellant's issues involve claims of ineffective assistance of counsel. The law is well settled that counsel is presumed effective. ***Commonwealth v. Washington***, 927 A.2d 586, 594 (Pa. 2007). In order to overcome that presumption, "a PCRA petitioner must plead and prove that: (1) the legal claim underlying the ineffectiveness claim has arguable merit; (2) counsel's action or inaction lacked any reasonable basis designed to effectuate petitioner's interest; and, (3) counsel's action or inaction resulted in prejudice to petitioner." ***Commonwealth v. Mason***, 130 A.3d 601, 618 (Pa. 2015).

In determining whether counsel had a reasonable basis, the issue is not "whether there were other more logical courses of action which counsel could have pursued[,]" but "whether counsel's decisions had any reasonable basis." ***Commonwealth v. Bardo***, 105 A.3d 678, 684 (Pa. 2014) (citations omitted). If it is a matter of strategy, we will not find a lack of reasonable basis unless "an alternative not chosen offered a potential for success substantially greater

than the course actually pursued." **Commonwealth v. Spotz**, 84 A.3d 294, 311-12 (Pa. 2014). In order to demonstrate prejudice, "a petitioner must show that there is a reasonable probability that, but for counsel's actions or inactions, the result of the proceeding would have been different." **Mason**, **supra** at 389. All three prongs of the test must be satisfied in order for a petitioner to be entitled to relief. **Id**.

We turn first to Appellant's claim that counsel was ineffective when he failed to object to Victim's testimony recounting her conversations with K.C. Victim testified to the following. She awoke at 4:30 a.m., and she told K.C. that she had a crazy dream. K.C. replied, "it wasn't a dream." N.T. Trial Vol. I, 2/11/15, at 51. K.C. added, "everything you told me, it happened." **Id**. According to Victim, K.C. told her she "needed to tell somebody." **Id**. Victim also recounted a telephone conversation she overheard between K.C. and Victim's former boyfriend in which K.C. told him "my stepfather [Appellant] raped [Victim]." **Id**. at 52. Defense counsel did not object to any of the foregoing hearsay testimony, and Appellant claims on appeal that counsel had no reason not to object.

At the evidentiary hearing, trial counsel offered the following strategic basis for not objecting to the hearsay testimony. He "wanted the testimony in" because it supported the defense theory that Victim was intoxicated and uncertain of what had occurred, and that K.C. "planted the seed" of the rape. N.T. PCRA Hearing, 3/25/19, at 24. In counsel's view, the hearsay testimony

obviated the need for the defense to call K.C., whom counsel believed would not have offered testimony favorable to the defense. *Id*.

The PCRA court credited trial counsel's explanation of the reason why he did not object. PCRA Court Opinion, 6/11/19, at 11. The court also concluded that counsel "acted with a strategic basis, which he designed to advance an alternate theory that supports [Appellant's] innocence." *Id*. at 10. According to the PCRA court, both Victim's hearsay testimony of her conversation with K.C. and her account of K.C.'s conversation with Victim's boyfriend served the same strategic purpose, and thus, did not lack a reasonable basis.

Appellant contends that counsel had no reasonable strategic basis for failing to object to hearsay statements made by a non-testifying witness that Appellant raped Victim. Appellant's brief at 8. He alleges further that counsel recognized the damaging nature of the statements when he established on cross-examination that the declarant would not have had any personal knowledge of whether a rape occurred. *Id*. Appellant maintains that, "to the extent that trial counsel actually pursued a theory that [Victim] had confused a dream for reality, trial counsel already had what he needed to argue such a theory . . . without admitting inculpatory hearsay." *Id*. at 9. He directs our attention to Victim's testimony that she believed the alleged incident was dream. N.T. Trial Vol. 1, 2/11/15, at 170. He contends that counsel could have argued that Victim imagined the incident without allowing hearsay

evidence of statements by K.C. incriminating Appellant. Appellant argues in the alternative that there were wiser strategies, such as arguing that Victim "fabricated the assault allegations rather than explain to her friend that she had consented to sexual intercourse with her friend's married step-father."[1] Appellant's brief at 10.

Counsel's assistance is deemed constitutionally effective "if he chose a particular course that had some reasonable basis designed to effectuate [the] client's interest." **Commonwealth v. Sneed**, 45 A.3d 1096, 1107 (Pa. 2012). Counsel admittedly chose a hybrid strategy, which required him to walk a fine line between the scenario where Victim was so intoxicated that her memory was unreliable, and the situation where, although she had been drinking, she was not unconscious and, thus, capable of consenting. In either scenario, there was no rape. With regard to the first strategy, counsel sought to establish that K.C. made up the rape and suggested that it occurred to the intoxicated and confused Victim. The value in the hearsay testimony lay in painting K.C., whom counsel established was not present when the rape allegedly occurred, who would have had no personal knowledge of the facts,

---

[1] In the PCRA court, Appellant argued that the only two realistic defenses once the Commonwealth introduced DNA testimony were: (1) that Victim was capable of consenting, in fact consented, and later fabricated the rape allegation; or (2) that the DNA results were erroneous. **See** Defendant's Supplemental Brief, 5/12/19, at 4. The PCRA Court found that neither strategy was "so much more likely to succeed that it made trial counsel's chosen defense unreasonable." **See** PCRA Court Opinion, 6/11/19, at 10 n.4.

and who did not testify at trial, as the fabricator of the rape story. Furthermore, K.C. propagated the lie when she called Victim's former boyfriend to report it. Admittedly, the strategy was not successful, but it was not unreasonable.

The existence of other strategies that may have offered a greater likelihood of success is of no moment unless the petitioner proves that the alternative not chosen offered a substantially greater potential for success, which the PCRA court found Appellant did not demonstrate. *Commonwealth v. Williams*, 732 A.2d 1167, 1189 (Pa. 1999). We find no error. Hence, no relief is due on this claim.

Appellant's second claim of ineffectiveness involves counsel's alleged failure to investigate and call four witnesses, three of whom were present when he and Victim arrived home. Two of the proffered witnesses would have offered testimony tending to explain that Appellant went to New York for fear for his safety and established that the minivan where the alleged sexual assault occurred remained in Appellant's driveway for at least a week after the incident. Such testimony, Appellant contends, would have undercut Trooper Wesnak's testimony implying that Appellant fled in the minivan to avoid apprehension and that the minivan was unavailable for execution of a search warrant.

All four witnesses testified at the evidentiary hearing. Appellant's stepson, Angel Ramos, and Mr. Ramos's girlfriend, Iraida Geldres, testified

that they were at Appellant's home that evening when he and Victim returned. Mr. Ramos stated that when Victim walked in, "she walked in normally. She wasn't stumbling or staggering or anything like that. She just went right upstairs to my sister's room." N.T. PCRA Hearing, 3/25/19, at 32. He also reported that he received a telephone call early in the morning from Appellant. Appellant told him that "he was in trouble, that somebody was threatening his life[,]" and "I believe that somebody had came to the front door with a baseball bat and the husband . . . had a weapon . . . a firearm." *Id*. at 34. In response to that call, Mr. Ramos went to Appellant's home, retrieved him, and drove him to New York. At that time, Mr. Ramos saw the gray minivan parked in the driveway by the side entrance to the house, and he testified that the vehicle remained in that location for two weeks. *Id*. at 35.

Ms. Geldres confirmed that she saw Victim and Appellant briefly when they entered the kitchen that night. Victim was walking fine and showed no signs of inebriation. *Id*. at 43-44. Ms. Geldres stated that she would have been willing to testify if she had been asked.

Another stepson, Andrew Cordova, testified that he saw Victim come into the house and go upstairs. He saw nothing unusual in the way she proceeded. She seemed perfectly fine and there was no indication that she was intoxicated. *Id*. at 52-53. He also explained that, at around 2:00 or 3:00 a.m. that night, Victim's parents banged on the door. *Id*. at 54. The mother had a bat in her hand and the father carried a firearm. *Id*. The father said

he was going to kill Appellant. *Id*. Mr. Cordova also testified that the van remained in the driveway for one week, and that he then moved it elsewhere. *Id*. at 56. Two weeks after the incident, Mr. Cordova drove it to New York and left it with his stepfather. No one contacted Mr. Cordova to determine what he knew about the incident or whether he was willing to testify, although he was willing to testify.

The fourth proffered witness was Appellant's cousin, Damaris Otero. Mr. Otero confirmed that Appellant was dropped off at his home in New York, and remained there for several weeks. While there, Appellant used Mr. Otero's truck, and Mr. Otero stated that he never saw Appellant with a van while he was in New York. The witness stated that he would have testified if asked.

Trial counsel testified that he did not call Mr. Ramos, Ms. Geldres, and Mr. Cordova because they would have undermined the defense's theory that Victim was so intoxicated that her memory was unreliable. *Id*. at 54. He only called Appellant's wife because he wanted the jury to see that they were still together.

The PCRA court accepted that there were four witnesses willing and available to provide allegedly exculpatory testimony for Appellant, that Appellant informed his counsel of these witnesses, and that other trial witnesses referred to them. Addressing first the question of whether counsel was ineffective for failing to elicit testimony from these witnesses impeaching Victim's account of her intoxicated condition, the court concluded that

counsel's decisions "were strategic decisions done with a purpose, as part of a coherent plan for the defense."  PCRA Court Opinion, 6/11/19, at 14. Moreover, the court concluded that such testimony would have been cumulative of the testimony offered by Nilda Diaz, Appellant's wife, and thus, there was no prejudice.  *See Commonwealth v. Spotz*, 896 A.2d 1191, 1229 Pa. 2006) (finding no prejudice for purposes of PCRA where counsel failed to introduce cumulative testimony of substance abuse).

In addition, the PCRA court found no prejudice as the testimony of these witnesses "carried little probative value."  PCRA Court Opinion, 6/11/19, at 15.  The court pointed to inconsistencies in the testimony of Mr. Ramos and Ms. Geldres about their marital status, where they were standing when Victim entered the home that night, and whether Mr. Ramos was smoking a cigarette at the time.  Their testimony also contradicted that of Appellant's wife, who told the jury that only her children were with her that night.  In the court's view, the inconsistencies in the evidence diminished its value as impeachment, and its admission would have not changed the outcome of the case.  *Id*. at 16.

As the PCRA court has the opportunity to assess and weigh the credibility of witnesses, we generally defer to its credibility determinations. *See Commonwealth v. Spotz*, *supra* at 1227 (citing *Commonwealth v. Spotz*, 870 A.2d 822, 836 (Pa. 2005)) ("Appellate courts do not act as fact finders, since to do so would require an assessment of the credibility of the

testimony and that is clearly not our function."). We find support for the PCRA court's conclusion that the proffered testimony tended to undercut counsel's strategy, was cumulative of the testimony of Appellant's wife, and contained inconsistencies that rendered it weak impeachment evidence. In light of the foregoing, Appellant failed to demonstrate that there was a reasonable probability that, but for counsel's failure to elicit the foregoing testimony from these witnesses, the outcome of the trial would have been any different. ***Commonwealth v. Pierce***, 786 A.2d 203, 213 (Pa. 2001) (defining prejudice in the PCRA context as a demonstration "that there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different.").

Appellant also contends that the proffered testimony of Mr. Ramos and Mr. Cordova regarding the threats made against Appellant were critical to rebut Trooper Wesnak's implication that Appellant fled to avoid police questioning. In addition, their testimony that the minivan remained in the driveway tended to refute the Trooper's testimony that he could not find and impound the minivan and obtain a search warrant to examine it for DNA and other evidence. Appellant maintains that, without the witnesses' testimony, the jury was left to infer that Appellant fled out of consciousness of guilt, and that he hid the minivan to avoid its inspection and perhaps destroy evidence.

The PCRA court concluded that the proffered testimony did "not rebut Trooper Wesnak's testimony in any material way, and so would not have had

a consequence on the trial." PCRA Court Opinion, 6/11/19, at 18. The court pointed to cross-examination of the Trooper that he did "not examine the van because he did not know where it was and could not contact [Appellant] about locating it." *Id*. (referencing N.T. Vol. 1, 2/11/15, at 187). The PCRA court found that none of the witnesses would have dispelled any suggestion that Appellant hid and destroyed evidence. The court characterized the Trooper's testimony as establishing only that, by the time he could locate the van, any evidentiary value would have been compromised. In the court's view, the proffered testimony regarding the whereabouts of Appellant and the minivan "would not have been material or helpful to the defense, and so [Appellant's] claim for ineffective assistance must fail." *Id*. at 19.

Preliminarily, we note that much of what Appellant allegedly told Mr. Ramos during the late night telephone call, specifically that he had been threatened by Victim's parents, was arguably inadmissible hearsay. Mr. Cordova's account of Victim's parents banging on the door and threatening Appellant was largely cumulative of the testimony of Victim's mother. She testified that she had a baseball bat in her hand when she, accompanied by and her former husband, entered Appellant's home to retrieve Victim on the night of the incident. Furthermore, neither Mr. Ramos nor Mr. Cordova could have testified from his own personal knowledge that Appellant went to New York for fear of retaliation from Victim's family, rather than to avoid police questioning.

Mr. Ramos and Mr. Cordova proffered inconsistent testimony regarding the length of time the minivan remained in Appellant's driveway. Assuming that the minivan was at Appellant's home for some time after the incident, perhaps Trooper Wesnak could have obtained a warrant to examine and test it for DNA evidence. However, such testimony did not exclude the possibility that the minivan would have been cleaned before a warrant could have been obtained. In short, while there may have been some minimal impeachment value from the testimony of these witnesses regarding the whereabouts of the minivan and its accessibility for testing, it was unlikely that the absence of this evidence changed the outcome of the proceeding in light of DNA evidence obtained from Victim. Hence, this claim does not merit relief.

Finally, Appellant contends that his counsel was ineffective for failing to object and seek a curative instruction when Trooper Wesnak testified in response to a question as to why he did not obtain a warrant for the minivan, that Appellant chose to retain counsel and not make a statement. The Trooper stated, "by the time [Appellant] had turned himself in, on the advice of his attorney, he did not want to answer anymore (sic) questions." *See* N.T. Trial Vol. 1, 2/11/15, at 187. Appellant characterizes the Trooper's offending testimony as a non-responsive answer to defense counsel's question whether he had sought a warrant for the minivan. Appellant contends that there was no legitimate purpose for the officer to refer to his post-arrest silence and decision to hire an attorney, as it was not impeachment or fair response to

the defense. He argues that the claim is of arguable merit as the prosecution is not permitted to use a defendant's decision to remain silent or retain counsel as evidence of guilt, citing, *inter alia*, **Commonwealth v. Molina**, 104 A.3d 430 (Pa. 2014) (plurality) (reversing and ordering a new trial as prosecutor's exploitation of non-testifying defendant's silence as substantive evidence of guilt was not harmless). Appellant also directs our attention to **Commonwealth v. Costa**, 742 A.2d 1076, 1077 (Pa. 1999), where the court found no reasonable basis for counsel not to object to a police officer's testimony elicited by the prosecutor that the defendant did not say anything to him after the charges were filed.

At the evidentiary hearing, trial counsel maintained that he did not object because the jury had already heard the statement, and based on his experience, an objection or curative instruction would only have highlighted the testimony. N.T. PCRA Hearing, 3/25/19, at 23.

The PCRA court viewed Trooper Wesnak's reference as fair response to the defense's criticism of the Trooper's thoroughness in failing to apply for a search warrant for the Appellant's minivan. The court also characterized the Trooper's statement as a "fair recounting of the investigation concerning the van" and an explanation why he believed that "enough time had passed to make . . . a search . . . futile." PCRA Court Opinion, 6/11/19, at 22. In the court's view, the answer did not imply that Appellant's silence was an admission of guilt, but merely explained the limits placed on the police

investigation. Thus, the court concluded, there was "no arguable merit to the claim that trial counsel should have objected[,]" or in the alternative, trial counsel had a reasonable basis for not objecting. *Id*. at 23.

Preliminarily, we note that while Appellant characterizes the Trooper's testimony as a reference to his **post-arrest** silence, it is unclear from the certified record whether Appellant was under arrest or had received his *Miranda* warnings when he invoked his Fifth Amendment right against self-incrimination. However, the timing of Appellant's assertion of his right to remain silent does not impact our legal analysis.[2] In *Molina*, *supra* at 450-51, a pre-arrest silence case, our Supreme Court held that "the timing of the silence in relation to the timing of an arrest is not relevant to the right against self-incrimination." The relevant inquiry was whether the mention of the defendant's silence was used by the prosecution as substantive evidence of guilt. The Court held that such use was prohibited unless it fell within an exception such as impeachment of a testifying defendant or fair response to an argument of the defense.

In *Molina*, the prosecutor argued that the defendant's silence was "most telling," asked the jury "why" the defendant refused to cooperate with

---

[2] Appellant's argument did not turn on whether the Trooper's reference was to his pre-arrest or post-arrest silence. He cited *Commonwealth v. Molina*, 104 A.3d 430, 450-51 (Pa. 2014), for the proposition that the timing of the silence in relation to an arrest was not relevant to the right against self-incrimination. *See* Appellant's brief at 24.

the detective, and directed the jury to "[f]actor that in when you're making an important decision in this case as well." *Id*. at 452-53. Our High Court held that the defendant's right against self-incrimination was violated as the prosecutor used the defendant's silence to imply his guilt, and concluded that the error was not harmless.

The reference herein was brief and elicited upon questioning by the defense. It was not exploited by the Commonwealth on cross-examination or during closing argument. In response to defense counsel's question why he did not obtain a search warrant to examine the minivan for evidence of the alleged sexual assault, Trooper Wesnak testified that he did not seek a search warrant because he did not know where the van was and he could not locate Appellant to ask him. He added that, by the time Appellant turned himself in, he would not answer questions based on the advice of counsel.

As this Court held in **Commonwealth v. Guess**, 53 A.3d 895, 903 (Pa.Super. 2012), the rule precluding reference to a defendant's silence "'does not impose a *prima facie* bar against **any** mention of a defendant's silence' but rather 'guards against the exploitation of a defendant's right to remain silent by the prosecution.'" **Id**. citing **Commonwealth v. Adams**, 39 A.3d 310, 318 (Pa.Super. 2012) (quoting **Molina**, **supra** at 63) (emphasis in original). Moreover, in **Adams**, we relied upon **Molina**, in concluding that, "the mere revelation of a defendant's pre-arrest silence does not establish innate prejudice where it was not used in any fashion that was likely to burden

- 18 -

defendant's Fifth Amendment right or to create [an] inference of admission of guilt." **Adams**, **supra** at 318 (quoting **Molina**, **supra** at 56).

We find that such evidence of Appellant's silence was fair response to the defense's argument that the Trooper had not sought a search warrant for the vehicle and an explanation of the investigative timeline. Consequently, an objection would not have altered the outcome of this case. **See Commonwealth v. DiNicola**, 866 A.2d 329 (Pa. 2005) (reference to a defendant's refusal to speak to trooper constituted fair response to defense counsel's questioning of the adequacy of the trooper's investigation). Herein, the brief reference to Appellant's silence served another purpose other than suggesting guilt. **See Adams**, **supra** (finding that a brief reference by detective to defendant's silence did not violate the Fifth Amendment where it was not intended to imply a tacit admission of guilt but to recount the sequence of the investigation).

We find misplaced Appellant's reliance upon **Costa**, **supra**. Therein, we determined that trial counsel was ineffective for failing to object when a police detective testified that the defendant said nothing to him when charges were filed against him for the molestation of a young boy. The court concluded that there was no proper purpose for the testimony other than to highlight the defendant's silence, which was not the case herein. Hence, we find no error in the PCRA court's conclusion that Appellant is not entitled to relief on this claim.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>5/7/20</u>